UNITED STATES DISTRCT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| DERRICK STEFAN WILLIAMS, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 C 5045 |
| | ) | Hon. Marvin E. Aspen |
| WESLEY HARMSTON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is Defendant Dr. Wesley Harmston's motion for summary judgment. Plaintiff Derrick Stefan Williams, a former pretrial detainee at the Will County Adult Detention Facility ("WCDF"), filed this civil rights action against Dr. Harmston pursuant to 42 U.S.C. § 1983 alleging that Dr. Harmston behaved in an inappropriate manner during two medical examinations of Williams in the fall of 2014. (Compl. (Dkt. No. 1) at 4–5.) For the reasons stated herein, we grant Dr. Harmston's motion for summary judgment.

**BACKGROUND**

Williams was a pretrial detainee at WCDF starting in August 2014 and at all times relevant to his claims. (Def.'s L.R. 56.1(a) Statement of Undisputed Facts ("SOF") (Dkt. No. 88) ¶ 1.) From June 2012 to June 2015, Dr. Harmston was a licensed doctor providing medical services to inmates at the jail. (SOF ¶ 2.) Williams' claims of sexual harassment against Dr. Harmston stem from medical examinations Dr. Harmston conducted of Williams' elbow, neck, back, and ribs, which Williams contends were injured during his arrest in August 2014. (SOF ¶¶ 3–4, 8–9.) As relevant here, Dr. Harmston saw Williams on September 22, 2014

1

to examine an elbow injury. (Dkt. No. 86–2 at PageID #:673–75.) Williams returned for treatment on October 6, 2014 complaining of an injury to his ribs after allegedly being kicked by police during his arrest. (*Id.* at PageID #:676–78.)

During the October 6, 2014 medical appointment, Dr. Harmston asked Williams to remove his shirt to examine his chest, back, neck, and abdomen both by visual examination and palpation. (*Id.* ¶¶ 11, 13–14.) Dr. Harmston maintains that it would be impossible to examine Williams' rib injuries without having Williams remove his shirt, as he needed to perform a visual examination and palpate the injured areas to assess tenderness, irregular movement, changes to the skin, and symmetry. (*Id.* ¶¶ 12, 14–15.) Williams disputes whether it was medically necessary to remove his shirt and have his neck, arm, chest, and rib area visually examined and palpated. (*Id.* ¶¶ 13–14.) Dr. Harmston also ordered an x-ray in order to rule out acute rib fractures and dislocations, as undiagnosed rib fractures may be life threatening. (*Id.* ¶¶ 16–17.)

In addition, Plaintiff alleges that during the October 6 visit, Dr. Harmston asked Williams if he wanted a prostate exam. (*Id.* ¶ 18.) Williams declined the offer, and Dr. Harmston never performed a prostate exam. (*Id.* ¶¶ 17–18.) Dr. Harmston contends that he did not discuss Williams' prostate health again, never touched Williams "on or in the vicinity of his genitals or rectum," and never "forced or coerced" Williams into undergoing a prostate exam. (*Id.* ¶¶ 19–22.) Dr. Harmston asserts that he asked Plaintiff about the exam because "as an African American male over the age of forty-five . . . Plaintiff was a member of at least two populations who experience increased risk of prostate cancer." (*Id.* ¶ 23.) Dr. Harmston further asserted that Williams had not had a prostate exam for years, and such exams are an important tool in early detection of prostate cancer. (*Id.* ¶¶ 24, 26.)

While Williams admits that Dr. Harmston did not perform a prostate exam, he disputes that Dr. Harmston never again discussed prostate health or touched Williams on or near his genitals or rectum. (Pl.'s L.R. 56.1(b)(3)(B) Resp. to Def.'s SOF ("Pl.'s Resp. SOF") (Dkt. No. 88) ¶¶ 20–22.)[1] Williams maintains that despite being a member of a population at high risk for prostate cancer, Dr. Harmston had insufficient grounds to inquire into prostate health, and the inquiry was not documented on the medical visit reports. (*Id.* ¶ 27; Pl.'s Statement of Add'l Facts ("PSAF") (Dkt. No. 88) ¶ 1.) Williams argues his complaints and injuries were unrelated to prostate cancer, and because Dr. Harmston was not examining him for a yearly routine exam, a prostate exam was "not part of the 'normal standard of care'" for his complaints. (Pl.'s Resp. SOF ¶ 26.)

Underlying Williams' claim and the reason he alleges he felt humiliation is his assumptions about Dr. Harmston's sexual orientation. (SOF ¶¶ 5–6.) Williams testified:

> Q. Had you ever discussed prostate health with Dr. Harmston before –
> A. Dr. Harmston is a fag.
> Q. Okay. I noticed in one of your records that you mentioned to the mental health professionals that you thought Dr. Harmston was gay?
> A. He is. He a fag.
> Q. Okay. Why did you think that was worth mentioning?
> A. Because he looked like a fag. He talked – he looked like a fag. He talked like a fag.
> Q. Okay. Why did you think that was important for the mental health professionals –
> A. Because I wanted to let them know they need to get rid of this dude.
> Q. Because he's gay?
> A. Yeah, gay.

---

[1] As we discuss herein, Williams supports his denials by stating "it is unclear how the Defendant can claim such a statement as undisputed based on his personal testimony," but Plaintiff does not otherwise support his denial with citations to the record. *See Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial. If the cited material does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation.").

<pre>
                              *      *      *
     Q.    And you saw Dr. Harmston complaining of various injuries?
     A.    Right.
     Q.    All right. And at the time that you saw him and made those complaints to
           him, you knew in your mind from your own perspective that you thought
           that he was gay?
     A.    Right.
     Q.    All right. And is it that reason why it was humiliating to you that he was
           rubbing you and asking you to take off your shirt and those things?
     A.    Right.
</pre>

(SOF ¶¶ 5–6 (quoting Williams Dep. (Dkt. No. 86–1) at 66–67, 70.)

Williams filed a Prison Rape Elimination Act ("PREA") complaint against Dr. Harmston. (*See* PREA Investigation Summ. (Dkt. No. 86–2) at PageID #:671.) The complaint indicated "the inmate perceived the physical contact made during the medical exam was inappropriate and that the Doctor asked the inmate if he would like a rectal exam." (*Id.*) The PREA investigation summary indicated that "[u]pon review of the documentation submitted, the incident has been determined to be . . . unsubstantiated," meaning the investigation concluded that "evidence was insufficient to determine whether or not the event occurred." (*Id.*) The comments to the summary stated "[i]nvestigation of [Williams'] allegations were found to be unsubstantiated" and Dr. Harmston "was following the standard protocol for male inmates and asked the inmate about the rectal exam because it is one of the items on the examination chart that needs to be checked off." (*Id.*) The comments further indicate Dr. Harmston "by nature appears to have a bedside manner that is demonstrative and reassuring by placing his hand on patients [sic] back or arm in a reassuring manner and there is no indication that the intent of this physical contact is of a sexual nature." (*Id.*) Following the PREA complaint, Dr. Roz Elazegui, the regional medical director, met with Dr. Harmston "to discuss the complaint and possible changes in Dr. Harmston's bedside manner." (PSAF ¶ 2.)

Williams filed the instant complaint on June 8, 2015, alleging violations of his Eighth and Fourteenth Amendment rights.  (Compl. ¶¶ 4–5.)  Dr. Harmston filed a motion for summary judgment on November 8, 2017 arguing that Williams has no evidence that Dr. Harmston intended to humiliate Williams or sexual gratify himself during medical examinations.  (Mem. in Support of Summ. J. ("Mem.") (Dkt. No. 86) at 3.)  In response, Williams cites testimony from his own deposition and the deposition of Dr. Harmston.  (Resp. to Summ. J. ("Resp.") (Dkt. No. 88) at 4–8.)  He also relies on an "unsolicited letter" received by Williams' attorney's law office from WCDF inmate William Clark postmarked December 10, 2017 as evidence of Dr. Harmston's subjective intent to sexually harass.  (*Id.*)  Williams contends the letter claims Dr. Harmston "fondled and pinched" Clark "a few years back."  (*Id.* at 5.)

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment only if he demonstrates there is no genuine issue of material fact and that he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor."  *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony."  *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014).  In determining the

existence of a genuine issue of material fact, a court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Weber v. Univs. Research Assoc., Inc.,* 621 F.3d 589, 592 (7th Cir. 2010). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

## ANALYSIS

Williams filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging Dr. Harmston sexually assaulted and harassed Williams while he was a pretrial detainee at WCDF in violation of his constitutional rights under the Eighth and Fourteenth Amendments. (Compl. at 4–5; *see also* Resp. at 1.) Specifically, Williams alleges that Dr. Harmston touched him "in a sexual manner" and offered him a prostate exam, which Williams alleges was a medically unnecessary procedure. (Resp. at 1.) Dr. Harmston argues that no evidence supports Williams' allegations that Dr. Harmston's actions were intended to humiliate Williams or to sexually gratify himself. (Mem. at 1.)

Under 42 U.S.C. § 1983, a plaintiff must show that "(1) the defendant deprived him of a right secured by the Constitution and laws of the United States and (2) the defendant acted under color of state law." *Waubanascum v. Shawano Cty.*, 416 F.3d 658, 664 (7th Cir. 2005). The second requirement is not disputed in this case.[2] At issue is whether the first element is met. As a pretrial detainee at the time of the relevant events, Williams is protected by the Fourteenth

---

[2] "It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 2255 (1988) (holding that a physician who was under contract with the state to provide medical service to inmates acted under color of state law within the meaning of § 1983); *see also Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413 (7th Cir. 1997). Because Williams' § 1983 claim stems from the medical treatment that Dr. Harmston provided as a medical doctor under contract at WCDF, Dr. Harmston acted under color of state law. (SOF ¶ 2.)

6

Amendment.  *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009).  Because "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment," we evaluate Plaintiff's claims under the Eighth Amendment framework.  *Id.*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain, thus forbidding punishment that is 'so totally without penological justification that it results in the gratuitous infliction of suffering.'"  *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 2929 (1976)).  Where prison officials harass or touch a detainee in a "manner intended to humiliate and inflict psychological pain," such conduct may constitute cruel and unusual punishment under the Eighth Amendment, even if no serious physical injury results.  *Id.*; *see also Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015) (explaining the alleged pain sufficient to constitute an Eighth Amendment violation may be physical or psychological); *Lieberman v. Budz*, No. 00 C 5662, 2013 WL 157200, at *14 (N.D. Ill. Jan. 15, 2013) (stating "the right of a prisoner or detainee to be free from sexual harassment" is clearly established, including the right "not to be groped for sexual reasons").

"Under the controlling precedent of the Supreme Court, the test for determining whether a prisoner has suffered cruel and unusual punishment has two components, one objective and one subjective."  *Fillmore v. Page*, 358 F.3d 496, 509 (7th Cir. 2004).  Plaintiff must establish the objective component by showing "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation," and the subjective element by showing "the officials act[ed] with a sufficiently culpable state of mind."  *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 999–1000 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991)); *see also Lewis*, 581 F.3d at 476 (analyzing a § 1983 claim using

the objective and subjective components). In their briefs, both parties focus exclusively on whether Williams can support the subjective element of his claim, and because we find it dispositive, we decline to undertake an analysis regarding the objective component.

Williams argues Dr. Harmston "deliberately violated [Williams'] constitutional rights because he intended to humiliate him, and derive sexual pleasure from overly caressing and hugging him during a medical visit." (Resp. at 3.) To prove subjective intent, Williams must show that Dr. Harmston had a sufficiently culpable state of mind to sexually harass or sexually assault. *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012). "Subjective intent . . . unless admitted, has to be inferred rather than observed." *Id.* In particular, we may infer subjective intent to sexually harass or sexually assault when there is an uninvited touching or verbal harassment in the absence of a "penological, medical, or security justification." *Lieberman*, 2013 WL 157200, at *13; *see also Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (finding strip searches performed without a valid reason may evidence intent to humiliate and cause psychological pain); *Bourbeau v. Franzen*, No. 97 C 4601, 1998 WL 565042, at *3–4 (N.D. Ill. Aug. 31, 1998) (explaining it is relevant to consider verbal abuse "as it relates to the subjective component" of a § 1983 claim).

Williams contends that "[m]ultiple factors of the Defendant's actions and reputation in his place of work can be determinative of his mental state." (*Id.*) To this end, Williams makes three arguments in support of his position that a genuine dispute of material fact exists as to Dr. Harmston's requisite subjective intent: (1) Dr. Harmston's supervisor met with Dr. Harmston to discuss changes to his bedside manner; (2) Dr. Harmston was accused of a similar allegation in the past; and (3) Dr. Harmston had no medical justification for the manner in which he evaluated

8

Williams' rib injury or for asking Williams about his prostate health. (Resp. at 3–8.) We analyze each of these arguments in turn.

### A. Meeting About Dr. Harmston's Bedside Manner

Williams first argues that Dr. Elazegui's discussion with Dr. Harmston regarding "possible changes in Dr. Harmston's bedside manner" supports a finding of Dr. Harmston's subjective intent to humiliate Williams. (Resp. at 4.) Williams claims that Dr. Elazegui's discussion is "a fact clearly indicative of bad or inappropriate behavior." (*Id.*) He further argues that Dr. Harmston "avoided answering" questions about the meeting at his deposition, and speculates that failing to do so "was highly suspect" and "raises questions about his intent, motive, and accountability when performing his medical duties." (*Id.* at 4–5.)

However, Williams provides no evidence in support of his assertion that a discussion about possible changes to a doctor's bedside manner equates to a subjective intent to sexual harass or assault. In order to draw an inference in favor of a nonmoving party, there must be some evidence—other than mere speculation and innuendo—from which to draw the inference. *Gunville v. Walker*, 583 F.3d 979, 986 (7th Cir. 2009). Here, the evidence in the record regarding the meeting includes the deposition transcripts of Drs. Harmston and Elazegui. (*See* Dkt. Nos. 86–2, 86–3.) Dr. Elazegui testified "if there were any possible changes, it was probably just be careful because of the patient clienteles or, slash, inmates you're dealing with." (Elazegui Dep. (Dkt. No. 86–3) at 32–33 (testifying further "perhaps I just said, You know what? Be careful, these guys are inmates. And that's probably the only thing I would change.") Dr. Harmston did not specifically recall speaking with Dr. Elazegui following Williams' PREA investigation, but he testified he had discussed with Dr. Elazagui "approaches to medical care" including "being compassionate towards patients, even if a patient is a detainee how to be

9

considerate of them, [and] providing exceptional care even within correctional facilities." (Harmston Dep. (Dkt. No. 86–2) at 46–59.) Dr. Harmston also recalled "many discussions with Dr. Elazegui . . . which have included from bedside manner to a variety of different approaches to medication administration, to treatment of patients." (*Id.* at 54–55.)

Reading the deposition testimony in a light most favorable to Williams, it does not support an inference that Dr. Elazegui's discussion with Dr. Harmston about his bedside manner "raises questions about his intent, motive, and accountability when performing his medical duties," as Williams urges. (Resp. at 4–5.) Williams' assessment of Dr. Harmston's meeting with Dr. Elazegui is not based on personal knowledge, nor does he provide a factual account that contradicts the evidence offered by Dr. Harmston. Rather, Williams offers mere speculation and innuendo, and "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007); *see also Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc) (inferences "must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience"); *Beaumont v. J.P. Morgan Chase Bank, N.A.*, 782 F. Supp. 2d 656, 663 (N.D. Ill. 2011) ("The Seventh Circuit has long reject[ed] the idea that speculation can be employed as a substitute for proof in any context, and time and again has emphasized that when responding to a summary judgment motion it is not sufficient to advance a 'hunch.'") (internal quotation marks and citations omitted)). In sum, Williams' reliance on the meeting with Dr. Elazegui is insufficient to permit a jury to return a verdict for him as to Dr. Harmston's subjective intent. *Egonmwan v. Cook Cty. Sheriff's Dept.*, 602 F.3d 845, 849 (7th Cir. 2010).

### B. The Clark Letter

Williams also attempts to rely on the Clark letter to argue a genuine issue of material fact exists as to Dr. Harmston's subjective intent. (Resp. at 5–6.) The handwritten letter states in its entirety:

> Dear Sir,
> My name is William Clark Im a inmate at the Will County Adult Detention Facility. My reason for writing you. I was recently interviewed by a represented from the Department of Justice involving P.R.E.A. I informed him that on a previous incarceration a few years back, I was fondle and pinch by the doctor that was here. I've also talk to the staff here. Is it to late to file a claim. Any information would be appreciated. Dr. Harmston. I talk to Deputy Harkins, Sgt. Albano in Nov.
> Thank you
> William H. Clark.

(Clark Letter (Dkt. No. 88–1).) Williams argues the "letter, in conjunction with the Defendant's meeting with his supervisor regarding his bedside manner are indicative of his subjective intent." (Resp. at 6.) He further argues that the letter "indicates that this is not the first time Dr. Harmston has been faced with such allegations." (*Id.* at 5.) Dr. Harmston argues the letter is inadmissible on numerous grounds and therefore cannot defeat summary judgment. (Reply in Support of Summ. J. ("Reply") (Dkt. No. 89) at 7–9.) Principally, Dr. Harmston argues the letter was never produced in discovery, it is inadmissible hearsay, it is irrelevant, and it is inadmissible propensity evidence under Federal Rule of Evidence 404(b)(1). (*Id.*)

"Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville*, 583 F.3d at 985 (collecting cases). Williams offers no evidentiary basis for the letter's admissibility, and we find none. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Drake v. Minn. Min. & Mfg. Co.*,

11

134 F.3d 878, 887 (7th Cir. 1998) (quoting *Hadley v. Cty. of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983)). Instead of providing specific facts, the letter provides only vague innuendo; it is not clear what incident Clark describes, when it took place, or even whether it involved Dr. Harmston.

The letter is hearsay, and a "party may not rely on inadmissible hearsay to avoid summary judgment." *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011); *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (providing "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial," unless "some showing is made (or it is obvious) that [it] can be replaced by proper evidence at trial"). Rather than offer Clark's sworn testimony, Williams attempts to rely on an unsworn statement in the form of a letter from the declarant to prove the truth of the matter asserted therein—namely, that "this is not the first time Dr. Harmston has been faced with such allegations." (Resp. at 5.) The letter is a textbook example of hearsay and Williams has offered no exception to the hearsay rule under which it is otherwise admissible. *MMG*, 630 F.3d at 656 (excluding two letters offered to defeat summary judgment, finding them inadmissible hearsay and observing that sworn testimony would have been easy to obtain if the assertions made in the letters were true). Moreover, Williams never disclosed the letter nor named Clark as a witness during discovery, thus depriving Dr. Harmston from challenging the truth and reliability of the assertions made in the letter. (Reply at 7.)

Furthermore, the letter constitutes inadmissible character evidence under Federal Rule of Evidence 404(b)(1). "Rule 404(b) forbids the use of a person's prior bad acts only to show that same person's later action in conformity therewith." *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010). Other acts evidence "may be admissible for another purpose, such as proving

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *see also Treece v. Hochstetler*, 213 F.3d 360, 363 (7th Cir. 2000). However, other acts evidence is inadmissible "if its relevance to 'another purpose' is established *only* through the forbidden propensity inference." *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014). "[I]it is not enough for [the proponent] to say only that some 'other act' is relevant to intent or motive; the act must bear on intent or motive *without* relying on the notion that people are more likely to do something if they have the 'character' to do it." *Young v. City of Harvey*, No. 15 C 11596, 2016 WL 4158952, at *2 (N.D. Ill. Aug. 4, 2016).

Here, Williams is relying on the letter prove Dr. Harmston's subjective intent by suggesting the letter proves Dr. Harmston has engaged in sexually inappropriate behavior with another inmate. (Resp. at 5.) Williams thus attempts to use the letter for the inadmissible purpose of showing that because Dr. Harmston was accused of "similar" conduct in the past, he is more likely to have acted inappropriately toward Williams. *Perri v. Daggy*, 776 F. Supp. 1345, 1348 (N.D. Ind. 1991) (evidence of a police officer's prior misconduct was inadmissible under Rule 404(b) to demonstrate a "pattern of conduct"). "[I]n order to ensure that the evidence at issue is not offered to establish [the defendant's] propensity to commit the acts for which he is accused, we require that the prior bad acts evidence bear a singular strong resemblance to the pattern of the offense charged." *Treece*, 213 F.3d at 363 (internal quotations and emphasis omitted). Williams has done nothing to connect the allegations in the letter to Dr. Harmston, and Clark's accusations of a doctor "fondl[ing] and pinch[ing] him" are distinct from the inappropriate conduct alleged by Williams in this case. The letter is sufficiently vague such that it cannot support a finding that the alleged conduct is similar enough or close enough in

time to be relevant, as there is no indication whether the events Clark describes took place before or after Dr. Harmston examined Williams. In other words, even assuming the truth of the allegations in Clark's letter—and Clark is referring to Dr. Harmston as opposed to some other doctor—we cannot reasonably conclude they are relevant to determining whether Dr. Harmston's conduct toward Williams was intended to humiliate or sexually gratify. *See, e.g.*, *Steen v. Myers*, No. 1:04 C 174-TS, 2006 WL 335521, at *8 (N.D. Ind. Feb. 13, 2006), *aff'd*, 486 F.3d 1017 (7th Cir. 2007) (finding an affidavit alleging an officer abused his authority by harassing young people was inadmissible to show intent to harass plaintiff because the affidavit was not specific and was offered to prove action in conformity with a reputation for abusing authority).

Because the Clark letter is irrelevant and inadmissible, Williams cannot rely on it to create a genuine issue of material fact in order to survive summary judgment.

**C.      Medical Justification for Physical Examination and Prostate Exam Inquiry**

Williams also argues that Dr. Harmston's offer of a prostate exam "without sufficient medical basis," when considered "along with touching in a sexual manner," supports a finding that Dr. Harmston intended to "humiliate[] and derive sexual pleasure from touching, caressing, and hugging" Williams.[3] (Resp. at 8.) As set forth below, Williams fails to offer any admissible evidence in support of his claim that Dr. Harmston touched him "in a sexual manner" while examining Williams' rib injury. Likewise, he fails to support his claim that no medical basis for a prostate exam existed.

Williams' response is vague in describing the conduct he contends shows Dr. Harmston's intent to humiliate and derive sexual pleasure, but he appears to primarily take issue

---

[3] Williams concedes, however, that "the offering of a prostate exam would not constitute harassment" on its own, but rather "could help determin[e] subjective intent." (Resp. at 8.)

14

with (1) Dr. Harmston's request that Williams remove his shirt in order to conduct a visual examination of his rib injuries; (2) Dr. Harmston's physical evaluation of the rib injuries, including palpating Williams' neck, arm, chest, and rib area; and (3) any inquiry by Dr. Harmston as to Williams' prostate health. (Pl.'s Resp. SOF ¶¶ 12–16, 18–22.) Where a state actor articulates no legitimate justification for his conduct, a jury could infer the actions were "maliciously motivated and hence violated the Eighth Amendment." *Rivera v. Drake*, 497 F. App'x 635, 637–38 (7th Cir. 2012); *see also*, *e.g.*, *Hively*, 695 F.3d at 643–44 (reversing grant of summary judgment for prison guard where plaintiff asserted that guard gratuitously fondled his testicles); *Calhoun*, 319 F.3d at 940 (reversing dismissal of complaint where male prisoner alleged that defendants subjected him to sexually humiliating strip searches in the presence of female guards who were there as spectators, not to perform any penological function). Here, however, Dr. Harmston has presented ample, uncontroverted evidence that his examination of Williams was medically justified and consistent with the relevant standard of care in treating rib injuries. Likewise, aside from offering speculation and his own lay opinions, Williams fails to show Dr. Harmston's inquiry regarding prostate health evidences an intent to harass or embarrass.

1. Rib Injury Examination

With respect to Dr. Harmston's examination of Williams' rib injury, both Drs. Harmston and Elazegui testified that in order to treat the injuries in accordance with the applicable standard of care, Williams needed to remove his shirt for a visual examination of the chest, back, neck, and abdomen to assess rib movement, symmetry, and remarkable skin appearance such as bruising. (SOF ¶ 12; *see also* Harmston Dep. at 138–40; Elazegui Dep. at 49–50.) Likewise, examination of the rib injury required the doctor to palpate, or physically put pressure on the area

of the injury, in order to assess tenderness, irregular movement, changes to the skin, and symmetry. (SOF ¶¶ 14–15; Harmston Dep. at 139–41; Elazegui Dep. at 48–50.) Dr. Harmston further testified that a thorough examination of possible rib injuries is medically necessary as undiagnosed rib fractures can result in a punctured lung if untreated, which can be life threatening. (SOF ¶ 17; Harmston Dep. at 140–42.) While Williams denies Dr. Harmston's examination was conducted in a manner consistent with the applicable standard of care for evaluating and treating rib injuries, he fails to support his denial as required by Rule 56.1(b)(3)(A) and Dr. Harmston's facts about the medical necessity of the visual examination and palpations are therefore treated as undisputed. *See* L.R. 56.1(b)(3)(A) (requiring the non-moving party to submit a response to the moving party's statement of material facts containing "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon"). Plaintiff is not a doctor and cannot offer a medical opinion, and he has failed to produce any evidence contradicting the medical opinions of Drs. Harmston and Elazegui.

For example, in disputing Dr. Harmston's evidence showing it was necessary to remove Williams' shirt and to perform palpations to evaluate and treat his rib injuries, Williams relies on citations to his own response brief in opposition to summary judgment and Dr. Harmston's deposition. (*See* Pl.'s Resp. SOF ¶¶ 12–13, 15 (responding "This statement is very much disputed—the details of which are found in . . . Defendant's deposition pgs. 153–55, and in the Plaintiff's response to the Defendant's motion for summary judgment, pg. 8."); ¶ 14 (responding "This statement is very much disputed—the details of which are found in the Defendant's Deposition and in the Plaintiff's response to the Defendant's motion for summary judgment.").)

It is well-established that "[c]itations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004); *see also Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) (explaining that without "specific references to . . . supporting materials . . . . all material facts set forth in the movant's statement are deemed admitted."). Further, as Dr. Harmston observes, the specific deposition testimony Williams relies on does not support his denial and has no relevance to Williams' rib examination—rather, it concerns Dr. Harmston's inability to refuse to treat patients, a short discussion of Williams' weight, and whether Dr. Harmston documented any discussion about a prostate exam. (*See* Reply at 5; Harmston Dep. at 153–55. The testimony is therefore irrelevant, and we will not "review a lengthy record for facts that a party could have easily identified with greater particularity." *Ammons*, 368 F.3d at 818; *Herman v. City of Chi.*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing.").

Accordingly, there is no evidence supporting Williams' assertion that it was improper for Dr. Harmston to remove Williams' shirt and to palpate his neck, arm, chest, and rib area in order to diagnose and treat his rib injury, much less that Dr. Williams' did so with the intent to derive sexual pleasure or to humiliate Williams.[4] Subjective intent refers to the defendant's intent, not the plaintiff's perception. *Newbon v. Milwaukee Police Dep't*, No. 09 C 477, 2011 WL 3844095, at *4 (E.D. Wis. Aug. 30, 2011) ("The Plaintiff's subjective perception of an officer's intent does not suffice to create a genuine issue of fact."). To the contrary, the uncontroverted evidence shows that to the extent Dr. Harmston touched Williams during his

---

[4] The only theory Williams set forth for why Dr. Harmston's examination was humiliating and constitutes sexual harassment is Williams' own belief and preconceptions about Dr. Harmston's sexual orientation. (SOF ¶¶ 5–6.) However, as Williams concedes in his response, "[s]exual orientation is . . . irrelevant to this claim." (Resp. at 8.)

17

examination, it was medically justified and consistent with the applicable standard of care. Accordingly, taking the facts in the light most favorable to Williams, he has offered no evidence from which a reasonable jury could find Dr. Harmston's conduct shows an intent to humiliate or derive sexual pleasure.

### 2. Inquiry Regarding Prostate Health

Additionally, Williams' contention that Dr. Harmston's offer of a prostate exam "without sufficient medical basis" cannot sustain his claim. First, it is undisputed that no prostate exam ever took place. (SOF ¶ 19.) Second, although Dr. Harmston did not specifically recall ever offering Williams a prostate exam, it is uncontested that Dr. Harmston did not ask Williams again about his prostate health, he never touched Williams on or in the vicinity of his genitals or rectum, and he never forced or coerced Williams into undergoing a prostate exam. (SOF ¶¶ 20–22.) Williams disputes these facts, but fails to cite any evidence to the contrary, instead asserting that the "details" on which his denial is based "are found in the Defendant's Deposition and in the Plaintiff's response to the Defendant's motion for summary judgment." (Pl.'s Resp. SOF ¶ 21; *see also id.* ¶¶ 20, 22 (denying Dr. Harmston never discussed prostate health again because "it is unclear how the Defendant can claim such a statement as undisputed based on his personal testimony").) As Williams again fails to provide any specific references to supporting evidence, we treat Dr. Harmston's facts as undisputed. *Ammons*, 368 F.3d at 817–18; *Bordelon*, 233 F.3d at 527.

Moreover, Dr. Harmston presented evidence that a medical basis existed for inquiring about prostate health, as Williams had not had a prostate exam for years and is an African American over the age of forty-five, making him a member of two populations who experience increased risk of prostate cancer. (SOF ¶¶ 23–24; *see also* Elazegui Dep. at 43–44.) Doctors are

afforded substantial "professional judgment" in their treatment of patients, and even medical malpractice does not rise to the level of a constitutional violation. *Gayton v. McCoy*, 593 F.3d 610, 623 (7th Cir. 2010); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 988 (7th Cir. 1998)). Williams offers nothing other than his own layman speculation and conclusory assertion that an offer of a prostate exam was "without sufficient medical basis" or that it creates any reasonable inference regarding Dr. Harmston's subjective intent. *Gunville*, 583 F.3d at 986; *Dorsey*, 507 F.3d at 627; *Visser*, 924 F.2d at 659. Accordingly, assuming Dr. Harmston asked Williams about his prostate health during an appointment to examine his rib injury, Dr. Harmston has presented a legitimate medical reason for the inquiry, and Williams presented no evidence from which a reasonable jury could conclude the inquiry was suggestive of an intent to humiliate or harass.

## CONCLUSION

For the reasons stated herein, Williams has failed to produce any admissible evidence of Dr. Harmston's subjective intent to humiliate or sexually harass, and no reasonable jury could find in his favor on this essential element of his claim. Accordingly, we grant Dr. Harmston's motion for summary judgment and dismiss this case with prejudice. It is so ordered.

 _____
 Honorable Marvin E. Aspen
 United States District Judge

Dated: May 30, 2018
 Chicago, Illinois